No. 24.—JOHN EPPS, plaintiff in error, *vs.* THE STATE OF GEORGIA.

[1.] It is better that trials before triors, to test the competency of a Juror, should, as in all other cases, be conducted publicly; still, they are not restricted to this mode only.

[2.] Where a Juror has been set down as disqualified, from a misapprehension of his answer, it is competent for the Court to correct the mistake, whenever it is discovered, and restore the Juror to the panel.

[3.] It is the right of the Court, either in civil or criminal cases, to propound any questions to the witnesses, which it may see fit, during the progress of the trial.

[4.] In cases of doubt, character is essential; and in all such cases, should

Epps *vs.* The State.

preponderate in favor of innocence, especially where life is involved. But where the charge is positively proved, it cannot avail.

[5.] If one makes an attack upon the person or premises of another, with intent to kill; and the gun of the assailant is accidentally discharged in the struggle, and the life of the other destroyed, it is murder.

[6.] To be of a Jury, in case of felony, one must have resided six months in the county, previous to the trial; a challenge, however, for want of qualification, in this respect, must be made before the Juror is sworn.

[7.] A casual remark, made to or by a Juror to another person, in the presence of the Court, is not of itself, necessarily suggestive of such an irregularity as will set aside the verdict.

[8.] Proof by a single witness, of the formation and expression of an opinion by a Juror against the defendant, will not be sufficient to impeach the verdict—the Juror himself having previously denied the fact, on oath, in his examination before the triors.

Indictment for murder, in Clark Superior Court. Tried before Judge JACKSON, August Term, 1855.

Defendant moved for a new trial in this stated case, on the following grounds:

1st. That the Court allowed the two triors, being Jurymen sworn to try the cause, to take out Benjamin Jones and other persons who were declared incompetent to try the case, and to converse with said persons in private.

2d. That the Judge said, in presence of a full panel of Jurors, that it was a strange thing that a man should have a decided opinion without having heard the testimony in the case.

3d. That the Court erred in his charge to the triors in the case of John Hawkins, a Juror who stated, in answer to question, that his opinion was now fixed and decided, provided the reports are true; that he had heard that the defendant had shot his father at his own house, and his opinion was, that he ought to be hung, and that he would give the defendant a fair trial. As to this Juror, prisoner's Counsel requested the Court to charge the triors, in arriving at the influence of a previously expressed opinion on the mind of a Juror, the triors must judge for themselves, from the opinion expressed, and their knowledge of human nature, and not from what

the Juror, himself, may say as to its influence upon his mind; which charge the Court declined to give.    Second.   That the fact that the Juror formed his opinion from a portion, only, of the facts, is no reason why he is competent, provided his opinion is fixed.   Upon which last request the Court charged, that an opinion, to disqualify, must be based on some of the facts or circumstances; and that the triors were to judge from the portion of the facts which the Juror heard, whether or not his opinion could deter him from giving the prisoner a fair trial.

The triors returned the Juror competent, and the prisoner challenged him.

4th.  That the Court erred in reference to Frances M. Blackman, a Juror who was put on triors, and being understood to answer that he *had* formed and expressed a decided opioion, was sit down for cause by Mr. Cobb, prisoner's Counsel, as many other Jurors, giving similar answers, had been sit down, by a kind of tacit consent with Solicitor General.   The Solicitor General then announced that the panel was exhausted; the Clerk stated that there were only three others on the new panel, when the Court said he was informed that Mr. Blackman was misunderstood in his answer ; that he had answered he had formed no opinion whatever; whereas, he had been understood to answer that he had formed and expressed a decided opinion.   The Court placed him again on the triors, and he was pronounced competent, and was challenged by prisoner.

5th.  That the Court erred, after the Solicitor General had asked the first question of Sanford Roberts, one of the State's witnesses, in taking the examination of said witness out of the hands of the Solicitor General and examining said witness himself.

6th.  That the Court erred in declining to charge the Jury as requested in the words requested (in writing); that is, "that in a case where there is but one witness to the immediate facts of the killing, as in this case, then the previous

peaceable and good character of the prisoner is, of itself, sufficient to raise a reasonable doubt of his guilt.

7th. That the Court erred in charging the Jury, that if the prisoner went to the house of the deceased with the intention of killing him, and broke down the door for the purpose of killing him; and in breaking down the door, the gun went off accidentally and killed deceased, the prisoner is guilty of murder; whereas, there was no evidence to warrant such charge. Because James Dee, one of the Jurors who tried the cause, was not a competent Juror, not having resided in said county but four months before the trial; which fact was unknown to the prisoner and his Counsel, until after said Juror was sworn to try the case.

9th. That Joseph M. Williams conversed with William Wood and another Juror, in the Court house, after they were sworn as Jurors to try the case.

10th. That John C. Benedict, one of the Jurors who tried said case, who was put upon triors, and denied before them having ever formed or expressed any opinion as to this case, and was by them decided to be competent, had previously formed and expressed a decided opinion, unfavorable to the prisoner; which fact was unknown to the prisoner or his Counsel until after the verdict was rendered in said case.

In support of the motion, the following affidavits were filed:

GEORGIA, CLARKE COUNTY:

Personally appeared, Anderson W. Reese, who being duly sworn, says, that after a portion of the Jury were sworn in the case of The State *vs.* John Epps, on his trial for murder in Clark Superior Court, at August Term, 1855, he, deponent, saw persons conversing with the Jury; and more especially did he see Joseph M. Williams of said county, holding such conversation with William Wood, one of said Jury.

ANDERSON W. REESE.

Sworn to and subscribed before me, in open Court, August 30, 1855.           JOHN CALVIN JOHNSON,

Clerk S. C. Clark County, Georgia.

THE STATE
  *vs.*          } *Murder.*
JOHN EPPS.  }

Personally appeared, in open Court, Thomas R. R. Cobb, Howell Cobb, William H. Hull and C. Peeples, Counsel for defendant, who being duly sworn, saith, at the trial, James Dee was taken and sworn as a Juror in the above case; they were not aware of the fact that the said Dee had resided in this county only four months; that he was put upon triors at the instance of defendant, and found competent.

> HOWELL COBB,
> THOS. R. R. COBB,
> WILLIAM H. HULL,
> C. PEEPLES.

Sworn and subscribed in open Court, August 20th, 1855.

> ASA M. JACKSON,
> Ordinary Clarke County, Georgia.

The above stated Counsel farther state, on oath, that they had no knowledge or intimation that the Juror, Benedict, had formed and expressed an opinion as to this case, until after the verdict was rendered.

> THOS. R. R. COBB,
> HOWELL COBB,
> WM. H. HULL.

Sworn and subscribed in open Court, August 20th, 1855.

> JOHN CALVIN JOHNSON,
> Clerk S. C. Clarke County, Georgia.

THE STATE *vs.* JOHN EPPS.

In open Court appeared John Epps, who, on oath, saith that he was not aware that James Dee was not a citizen of this county; and consequently, not qualified to act as a Juror, until after the verdict was returned by the Jury.

> JOHN EPPS.

Sworn to and subscribed before me, August 20th, 1855.

> ASA M. JACKSON,
> Ordinary Clarke County, Georgia.

Epps *vs.* The State.

GEORGIA, CLARKE COUNTY:

Personally appeared, James Dee, who, on oath, saith that he has been a citizen of this county only four months; that he was one of the Jury that tried the case of The State *vs.* John Epps, murder; that he formerly resided in this county and had his family here; that in the month of March, 1854, he moved away from this county, with the intention to remain, and carried his family with him; that his family, up to this time, remained away, and that he returned to this county to reside about four months ago; that he did not state these facts when sworn as a Juror. JAMES DEE.

Sworn and subscribed before me this 20th of August, 1855.

JOHN CALVIN JOHNSON,
Clerk S. C. Clarke County, Georgia.

THE STATE
*vs.*
JOHN EPPS.
} *Indictment for Murder, in Clarke Superior Court.*

Personally appeared, in open Court, the defendant, John Epps, who, on oath, saith that he was not aware that John C. Benedict, one of the Jurors who sat on said case, had ever expressed any opinion with reference to this case, until he was sworn as a Juror in this case; that said Benedict was put upon triors by defendant, and before them denied having ever formed or expressed any opinion with regard to the case, and was declared by them to be competent, and was then accepted by defendant. JOHN EPPS.

Sworn to and subscribed before me, this 20th Aug. 1855.

JOHN CALVIN JOHNSON,
Clerk S. C. Clarke Co. Ga.

STATE OF GEORGIA, CLARKE COUNTY:

Personally appeared before me, John Calvin Johnson, Cl'k Superior Court of said county, Francis W. Winfrey, who, being duly sworn, deposeth and saith, that in the months of May, June and July of the present year, he, as often as six times, (and he thinks oftener,) heard John C. Benedict, a

Juror in the case of The State *vs.* John Epps, murder, say "that if he ever should be on the Jury, he would hang John Epps, and that he ought to be hung."

F. W. WINFREY.

Sworn to and subscribed before me 8th day of Sept. 1855.

JOHN CALVIN JOHNSON,
Clerk S. C. Clarke Co.

GEORGIA, CLARKE COUNTY:

Walton H. Booth, of the County and State aforesaid, personally before me, on oath, says, that William Wood, one of the Jurors on the trial of John Epps, in Clarke Superior Court, at August Term, 1855, frequently said in his presence, shortly after the death of Thomas N. Epps, that if he was on the Jury for the trial of said John Epps, that he would go for hanging him, and would stay on the Jury until he "*growed*" to the bench, and that the said John Epps ought to be hung without a Jury.    WALTON H. BOOTH.

Sworn and subscribed before me 8th Sept. 1855.

JOHN CALVIN JOHNSON,
Clerk S. C. Clarke Co.

GEORGIA, CLARKE COUNTY:

Personally appeared Wilson Lumpkin Biggs, who, on oath, saith that he heard John C. Benedict, about three months ago, say "that John Epps, the prisoner, ought to be hung; that if Epps was not hung, no man ought to be hung."

his
WILSON LUMPKIN ⋈ BIGGS.
mark.

Sworn to and subscribed before me this 20th Aug. 1855.

JOHN CALVIN JOHNSON,
Clerk S. C. Clarke Co.

In over-ruling the motion for a new trial, the Court took up the several grounds *seriatim,* and disposed of them as follows:

In regard to the 1st ground, the Court said that he al-allowed the triors (at first not Jurymen) to retire with the Juror upon his trial, under a practice recommended by the Supreme Court itself, after the Juror, upon trial, was asked such questions as the defendant's Counsel and the Solicitor General desired, in open Court.   The Court said to the tri-ors, they were at liberty to ask the Juror such questions as they wished, either in open Court, there, or retire with him up-stairs and ask them, which last was done by the triors in several instances.   After the two first Jurymen were sworn, they became triors for the remaining panels ; and asking for the same privilege, it was allowed them in the instance re-ferred to.   The Court is aware that, subsequently, the Su-preme Court had recommended, as the better practice, that a case before triors should be conducted as a case ordinarily is in Court, but was not, and is not now aware, that to allow the triors to ask the Juror questions in private, has been determined by our Supreme Court to be erroneous.   The Court followed the ruling of the Supreme Court in both ca-ses—1st. By allowing the Juror to be questioned by defend-ant's Counsel and the Solicitor General, and both to be fully heard before the triors, and then the charge of the Court upon the law ; and 2d. After all this was done, by allowing the triors further, if they desired it, to examine the Ju-ror (being the only witness) in private.   The Court is of opinion that no harm was done or could be done, by this course.   The triors, from the very nature of their duties, having to pass upon the competency of the Juror, must hear all he has heard of the case ; and, so far as their minds as Jurymen could be affected by it, they would be as much af-fected if heard in open Court as if heard in private.   The first ground is, therefore, over-ruled.   The second ground is over-ruled, the Court being utterly unable to see the slightest error in the remark, if made.

In regard to the 3d ground, the Court charged, dis-tinctly, that the formation and expression of an opinion of a decided character, would disqualify a Juror ; that they would

judge from all the Juror said formerly, and then from what he had heard about the case, as well as from their knowledge of human nature, whether he had formed and expressed such a decided opinion; if the opinion was decided, it was immaterial whether he had heard all or a portion of the facts from rumor. The Court is unable to see any error in refusing to charge in the exact words asked, or in charging as he did.

In regard to the 4th ground, the Court remarked, that he had to swear a great number of men to get a Jury in this cause— some five hundred men. In this long and tedious effort to get a Jury, the Jurors were often put rather informally upon the triors. Mr. Cobb, conducting the examination for defendant, on asking whether a decided opinion had been formed and expressed; and being answered in the affirmative, set down the Juror, the State acquiescing. When this Juror was thus set down, the Court was informed, by the Sheriff, that he had been misunderstood; that he answered " he had *not* formed and expressed an opinion." The Court directed him again to answer as to what he had said. He replied, " he had *not* formed and expressed an opinion."

The prisoner then challenged him. It is true he was the last man upon the panel, and the Court had asked the Clerk if he had another ready; but the panel had not been discharged, and the Juror had not left his seat; and the whole thing passed off rapidly, and in a moment or two. The Court can see no wrong to the defendant in it.

In reference to the 5th ground, the Court was taking down the testimony. The Solicitor General had told the witness to go on and relate what he knew about it. The witness talked too fast for the Court's ability to write, and he stopped the witness and then asked him to go on, saying to the witness as he would get down parts of the narrative, what then, what next? and perhaps putting other questions, with the view of getting the testimony fairly down. The Court is of the opinion that he has the right to ask any witness examined before him, any legal question he pleases, calculated to draw from the witness the truth, to shed light upon the

case, either for or against the prisoner. In this case, the Court thought the Solicitor General entirely competent to manage for the State, and did not interfere further than as above stated, and for the purpose mentioned; but if the Solicitor had omitted any question deemed by the Court important, he would have despised himself as a mere puppet, set up for a show, and not worthy to be a Judge, whose duty it is to ferret out truth and do justice, if he had not asked it.

In regard to the 6th ground, the Court declined to charge as requested, in the language requested, but charged that the peaceable character of the prisoner was a circumstance to which he was entitled, and a very strong circumstance, if there was but one witness, but diminishing in strength as that witness was corroborated by others. Whether it would raise a reasonable doubt or not, was for the Jury to determine from the credibility of the main witness and the other witnesses, the corroborating circumstances and all the evidence of the case. This Court thinks the charge given exactly right, and would not mislead the Jury by charging in the language requested.

In regard to the 7th, the Court charged the Jury, that if the prisoner went to the house of his father with intent to murder him, and finding the door closed, broke it down with the felonious intent to murder the old man when he got in; and if in the act of breaking the door down with that intent, as it flew open the gun was discharged, though unintentional, it was murder. In the opinion of this Court, that charge is the law, and fully authorized by the evidence. Indeed, one main point in the defence was, to reduce the crime to involuntary manslaughter; and it became necessary for the Court to instruct the Jury, fully, upon the law of manslaughter, and all the distinctions between it and murder, which was done with great fairness, if not liberality to the prisoner.

In regard to the 8th, if it had been made known to the Court that Dee had resided in the county but four months before the trial, he would have been rejected as incompetent; but on a motion for a new trial, the question is different. It:

was competent for the prisoner to ask him how long he had resided in the county. They took him without asking him the question or inquiring as to the fact. I am inclined to think he was not even put upon triors, but am not certain as to that. It was certainly the prisoner's duty to have informed himself. He had vigilant Counsel, who could have known it. He lived in Athens where they lived. Independently of the strict letter of the law, he was the better Juror from his short residence, and the prisoner received no injury from his being on the Jury on account of his short residence. Nowing that a new trial is equivalent to an acquital, I decline to grant it on this ground, when no real injustice has been done.

In regard to the 9th. In the crowded state of the bar with a panel of 48 men in it, it is difficult to prevent talking to the Jury, a single remark being made to one of them. The defendant must show that the remark was made about the case, and unfavorable to him, at least, before a new trial will be granted on this ground.

In this case, the Solicitor General proposed to file an affidavit on the part of the party charged, that he did not converse with the Juror, but the Court deemed it unnecessary. The defendant's Counsel contended that he did make a remark or two, but could not prove that anything improper was said.

In regard to the 10th ground, the affidavits of a young man named Biggs, produced to show the expression of opinion on the part of Benedict before the triors, swore he had expressed none; it was affidavit against affidavit; and the Court refused to grant a new trial on this ground. The Court gave defendant's Counsel until next day to produce other testimony they hoped to produce; they produced none, and the Court adjourned on Tuesday morning, being compelled to go to Walton. To-day two more affidavits are filed, one of which affects the same Juror, Benedict. This Court transmits them to the Supreme Court, to take such action thereon as that Court deems proper, simply remarking that the Solicitor General resides in Lawrenceville; has had no opportunity of getting counter affidavits, and the Juror, Benedict, no oppor-

tunity of being heard in his own defence, nor the other Juror now implicated. This Court is of the opinion that the case of murder was fully made out, and any impartial Jury would have rendered the same verdict. If a new trial, it will be impossible, in his opinion, to get another Jury to try the cause. With this remark, and with the consciousness of having discharged his painful duty to the country in the fear of God, he submits the whole matter to a higher and more learned tribunal, content to abide their judgment and obey their decision. The Court farther certified that it was to procure Winfrey's affidavit that time was desired and that Biggs swore, at that time, that Winfrey would swear what he has sworn.

The evidence was as follows:

PENELOPE S. EPPS: Thomas Epps, killed 25th July, 1854, in this county; prisoner is son of deceased; came to our house between 12 and 1 o'clock and cursed deceased, and went on and said he intended to kill him before sun-down that day. He picked up the chair and drawed the chair over him; told him the reason he was going to kill him; was because he was going to get Sam Gee to come there to live. Sam Gee married one of the sisters of witness. He said nothing else, except that if he killed him he would be satisfied; if they hung him the next minute he did'nt care. He then went home and got his gun; lived not very far off; about as far as from here to Mr. Vincent's. He never done or said anything when he came, but broke the door down and shot him. Saw him as he was coming. Deceased shut the door. Deceased was standing in the door when he was shot; fell out of doors; it was a rifle gun; shot him in his left shoulder; died the same day; there was nary a word said to nary a one of them; there had not been any difficulty between them before that time; not lately; they had fusses in time—a right smart time; it might have been a year, and may be more; deceased told prisoner, at first, to go home and behave himself; he said a great deal to deceased.

Cross-examination: Deceased did not say a word to John Epps that day; no body interfered when John drawed the chair, but he sot it down himself; door about two and a half feet above the floor. There was no scuffle at all; John was standing right at the door when he shot; the door shutter opens inside. Sam Gee's wife was at the house at that time; had been there since Friday. This was done on Tuesday. Deceased ordered witness, on Sunday, to leave that house and never come back there any more; she did not hear his threats; hè did not order Mrs. Gee away. Sam Gee and his wife were under an indictment for bigamy at that time; she came to Mr. Epp's house; he knew it too. Sarah Epps (daughter) was staying up at her brother-in-law's, Mr. Adams'; reckoned she could have come home when she wanted to; had been up there 2 or 3 months; 4 or 5 miles off.

SANFORD ROBERTS: Was there when John Epps killed him last year; don't recollect the month; laying by time; the old man was going through the pasture to see if there was any water in it for the horses; John asked me where he was going, and said he could'nt get him to pass by there so he could speak to him. Just as witness got down to the house, he come and sat down on the steps and said he wanted to talk in peace, and the old man said he wanted him to; John said but a few words, when he commenced cursing the old man; the old man was standing in the door, and he picked up a chair and threatened to split his brains open; he stepped out and said if he did'nt watch out he would have a ball in him before the setting of the sun, if he was buried in the middle of hell before 24 hours; witness saw him coming back with the gun; looked like he hardly had time to go home; witness then stepped to the back of the kitchen; heard something like the door burst down, and heard the gun go off; did'nt see the body until evening; had been living with the old man about two and a half months; ball went in about the left of the neck, on the shoulder.

Cross-examination: Lived in Athens ever since the difficulty; has no recollection of another word the old man said to

John that morning; John was standing in the door; Sam Gee's wife was there in the house; the old man, John, Sam Gee's wife and witness, were all that were in the house; all he could find out that John was mad about, was driving his sisters off and bringing Sam Gee there; Sam Gee's wife said nothing; she was standing sorter off to one side of the old man; John did not have the appearance of drinking.

Re-examined: Mrs. Epps was in the house when they first begun; did'nt see her afterwards; Ann is very nearly grown; was living there.

Dr. Thomas G. Macon: Mr. Epps was dead when he got there; got there between 12 and 1 o'clock; examined the wounds next day; ball struck about the inner third of the collar bone; ranged slightly upwards; severed the internal jugular vein, and lodged, he thinks, in the last cervical vertebra; did not extract the ball; thinks it was a gun shot wound; can't say whether it was a rifle or shot gun; deceased was lying about two feet from the door step or rock; was lying straight out.

Cross-examination: deceased and prisoner were about the same height.

Thomas Simonton, J. P: (Withdrawn for the present.)

Joshua Stevens: Witness, Smith Alexander and prisoner were going home; commenced about Mrs. Epps, deceased, and her connexions, and he observed to Smith, that if the old man got her connexions, one or both would die. This was sometime before the accident; thinks it was as much as a year.

Cross-examination: Had had feeling at one time. Explaining fracas. Epps peaceable, quiet boy, and he thought he was one of the mildest boys in the country; never heard of his striking anybody in his life; peculiar about drinking; would always cut out for home.

Smith Alexander: Talking about his father and the way he was treating his family; said he believed his father was the cause of his mother's death; thought he kicked her; said his father had married a woman and driven his sisters off, and

he thought it was very hard; that he was going to fetch more, and if he did, one or the other of them would have to die; a year, or about that, before the accident; said he would live agreeable and peaceable if he would not bring any more of the dam family; that he drove all his sisters off; he knew that the old man had driven them off long ago ; one was living at Joe Epp's and one at Mr. Adam's; Mary has been married three times; last husband is still alive; her first husband deserted her, several years before she married another.

Cross-examination: Saw John Epps between 9 and 10 o'clock the day it happened; Buck Shaw was with witness; John was in his shop; talked with Shaw, dunning him for an account; he did not talk with witness as he always did; witness does not know the cause of it; heard · Shaw remarked on it before he left him; Epps always a mild, steady fellow, and never heard of his having any difficulty before in his life; been at gatherings at witness's house, when he was drinking; he usually went off to himself, and sat down by himself, and pestered nobody ; when he was drinking could not tell well, unless he was close to him; was 20 yards off that morning; liquor made him quiet; said to Shaw he must be a drinking, or something was the matter with him.

Re-examined : John talked pretty fierce ; seemed to be pestered—interrupted in his feelings or something.

ALLEN GRIFFITHS: Three or four years ago, as they went to Edward's sale, this lady was sitting at the fire; John said he did not know what might happen in the family; prisoner was always a peaceable, gentlemanly fellow; wife of old man, 17 or 18 years old when he married her; tolerable old man, 60 years old.

DR. MACON, cross-examined again: The ball passed through the suspender; the hole in the suspender was about an inch and a half below the wound; from the course of the ball the deceased must have been reaching out his arm when he was shot.

To the decision over-ruling the said motion for a new trial, the defendant excepted; and the same is assigned as error.

COBB & HULL; PEEPLES; T. R.-R. COBB, for plaintiff.

WRIGHT, representing Sol. General, for defendant.

*By the Court.*—LUMPKIN, J. delivering the opinion.

We propose to examine, briefly and in their order, the several grounds upon which the new trial was asked and refused in this case.

[1.] The first complaint is, that the triors were permitted to retire with the Juror who was challenged, in order to find whether or not he stood indifferent between the State and the defendant.

That challenges to the *array* were tried publicly, there can be no doubt. The practice in such case, was for the Clerk to state to the triors the cause of challenge; and after he had so done, to conclude thus: "and so your charge is, to inquire whether it be an impartial array or a favorable one"; and if the triors affirmed it, the Clerk entered underneath the challenge, *affirmatur;* but if the triors found it favorable, the entry was *calumnia vera.* (*Trials per Pais,* 165.)

The rule, however, as to the trial of challenges to the polls, seems not to be so well settled. *Coke and Rolle* are silent upon this subject, and a different practice seems to have obtained in the State Courts touching it. It is every where agreed that the truth of the matter alleged as cause of challenge, may be made out by witnesses; and also, that the Juror challenged may, on his *voire dire,* be asked such questions as will test the state of his feelings, provided they do not tend to bring the Juror into infamy and disgrace.

This Court suggested, as the better practice, that the trial be conducted in the presence of the Court. We are still of that opinion. We do not feel at liberty, however, to decide authoritatively, that this shall be done; especially as a contrary course had pretty generally obtained in the oldest Circuit Courts.

In this case, the presiding Judge seems to have blended the two modes. After the Juror challenged was asked such questions, in open Court, as the Solicitor General and the defendant's Counsel saw fit to propound, the triors were allowed to retire with the Juror, for further examination. We still think the practice objectionable. And the fact that the triors are officers of the Court, acting in a judicial capacity, and liable to be punished for any misdemeanor, does not obviate the difficulty. The privilege thus conceded, is liable to gross abuse. We have reason to know that it is often abused. Better that this, as well as all other trials, be conducted openly—publicly. It is one of the best safeguards of a sound and correct administration of justice.

[2.] As to the remark which fell from the bench in the presence of a full panel of Jurors, that it was a strange thing that a man should have a *decided* opinion as to the guilt or innocence of the accused, without having heard the testimony in the case, we think it was incautious, and should not have been made, calculated, as it was, to intimidate the Jurors from that free and frank declaration, as to the state and condition of their minds, which it is the object of the examination to elicit. It does not appear, however, as it should do, that it resulted injuriously to the prisoner.

[3.] We see no error in the instructions given by the Court to the triors; nor in his refusal to charge them as requested. The law was stated correctly.

[4.] As to the fourth ground upon which the motion for a new trial was made, in reference to Francis M. Blackman, it is neither more nor less than granting to the Juror the privilege of correcting a misapprehension as to his answer. Is it possible that such permission should be denied?

[5.] We know of no limit to the right which belongs to the Court, of interrogating witnesses, either in civil or criminal cases, especially the latter. The life or death of a man may hang upon a full development of the truth. The presumption that this liberty will not be honorably and impartially exercised, is not to be tolerated for a moment. Counsel, in their

zeal to acquit their clients, seem to take it for granted that the only object of Courts is to convict. Until called upon to discharge the solemn and responsible functions of a Judge, they never can fully appreciate the high sense of obligation under which they act, to God and their fellow citizens. "Thy life for the murderer's life, if he escape," is the solemn denunciation of the Almighty! When they see, therefore, that a material fact has been omitted, which ought to be brought out, it is not only the right, but the duty of the pre-siding Judge, to call the attention of the witness to it, whether it makes for or against the prosecution; his aim being neither to punish the innocent nor screen the guilty, but to administer the law correctly. And let it be remembered, that Counsel seek only for their client's success; but the Judge must watch that justice triumphs!

[6.] The next error assigned is, that the Court declined to charge the Jury as requested in writing, "that in a case where there is but one witness to the immediate fact of killing, as in this case, then the previous peaceable and good character of the prisoner is, of itself, sufficient to raise a reasonable doubt of his guilt."

The first objection to this request is, that the proof did not warrant it. It is ingeniously drawn to meet the letter, perhaps, of the evidence, but not the substance of the testimony. It is true that Penelope S. Epps is the only witness who, in the language of the request, swears to the "immediate fact of killing." But read the statement of Sandford Roberts, and what a perversion of the evidence to assume that the widow of the deceased was the only witness of the homicide. Erase her testimony, entirely, from the record, and the Jury would have been more than justified in finding the prisoner guilty upon the evidence of Roberts. Indeed, if they believed him, they could not have done otherwise. The naked facts not only corroborate the testimony of both these witnesses, but, unexplained, point to John Epps as the murderer of his father.

Again: While it is shown that the defendant was a quiet

and peaceable man, it also appears that he had, for some time previously, cherished a spirit of bitter resentment toward his father for the wrongs which he accused him of inflicting upon his mother and sisters.   In the presence of Joshua Stevens, he declared that if the old man brought the relations of his present wife to his house, that one or both of them would die. Similar expressions, indicating the feelings and purposes of the defendant, were proven by other witnesses.   The general placability of the defendant, therefore, weighs not a feather under these circumstances.

The conclusion, then, is clear, that the legal proposition embodied in the request to charge, does not arise upon the facts of this case.   Is the principle itself tenable?   We think not.   Suppose there be but a single witness to the homicide, and yet, his character is such as to place his veracity beyond question, and he testifies under such circumstances as to preclude the possibility of mistake as to the identity of the slayer and all the accompanying circumstances, would the bare fact that the defendant was a mild and inoffensive man, be, of itself, sufficient to create a reasonable doubt as to his guilt?   We should be slow to enforce such a doctrine.   In cases of doubt, character is essential; and in all such cases, should preponderate in favor of innocence, especially where life is involved; but where the charge is positively proved, it cannot avail.   Such is our understanding of the law.

[7.] If there be error in the seventh ground, it was committed against the State, and not against the prisoner.   The proof was, that the killing was wilful—not accidental.   And Counsel for the accused had no right to ask a charge upon any other hypothesis.   We concur, however, with the Court, in holding that had it been accidental under the circumstances supposed, it would still have been murder.   If one goes to the house of another to take his life, and a death-struggle ensues on the one part to execute the felonious purpose, and on the other, to escape, and death ensues from the fortuitous firing of the gun, what is there, in such a case, to mitigate the offence?   A man points his rifle at me with intent to

shoot, and by some means, the ball is prematurely discharged; and I am killed. Can this be manslaughter?

[8.] Was James Dee a competent Juror? And if not, was the exception taken in time?

Decisions might be cited from the Courts of our sister States, directly sustaining the ruling of Judge JACKSON. But we prefer to affirm it upon indisputable ground. By the 38th section of the Judiciary Act of 1799, (*Cobb's Digest*, 545–'6,) no person is capable to be of a Jury for the trial of felony, who shall not be qualified to vote at elections for members of the Legislature; and if any person, not qualified as aforesaid, shall be returned on any Jury, he shall be discharged on the challenge and proof thereof, of either of the parties, or on his own oath, of the truth thereof: *Provided* that no exception against any Juror, on account of his qualification, shall be allowed after he is sworn.

Now it is admitted, that to qualify one to vote for the Legislature, he must usually have resided in the county for six months, and considered it his home or place of residence during that period. (*Cobb's Digest*, 239.) And consequently, Mr. Dee, the Juror, having lived in Clarke County for four months only last preceding the trial, he was incompetent to serve as a Juror. But it is equally clear, that under the *proviso* of the Act, the objection comes too late, not having been taken before the Juror was sworn. And it is no excuse that the disqualification was not known to the party or his Counsel. The Statute makes no such exception. It was their duty to have made inquiry, either of the Juror himself or of others.

An extreme case has been put to test the validity of this construction. Suppose, say Counsel, one or more of the Jury had been slaves or free persons of color, or females, and the disqualification had not come to the knowledge of the prisoner, as in this case, until after verdict? Our answer is, that if the disqualification was such, whatever it might be, as not to impinge the constitutional provision, that trial by

Jury, as heretofore practised, should remain inviolate, the verdict would stand. It might or might not, according to the nature of the disqualification, constitute a good ground for the interposition of the Executive. But a want of residence is no such ground; it is rather a recommendation, when the public mind becomes excited by the perpetration of a great crime, as in the present case.

[9.] It is next assigned as error, that Joseph M. Williams. conversed with William Wood and another Juror, after they were sworn to try the case. This transpired in open Court, and in the presence of the Judge. With a crowded court-room, it is impossible to prevent some casual remark of this sort. A Juror is, unexpectedly to himself, sworn and put upon the panel; he whispers to a friend some message to his family, or gives some directions concerning his horse. While we condemn the practice, as no one should speak to the Juror, nor he to them, without leave of the Court; still, no case has been found which decides that this is such an irregularity as will entitle the prisoner to a new trial; such misconduct as will require the verdict to be set aside. The Solicitor General offered to show that no such conversation took place. But the Court dispensed with the proof, the defendant's Counsel not pretending that his client was prejudiced.

[10.] The last error assigned is, that John C. Benedict, one of the Jurors who tried the case, having denied, under oath, that he had ever formed or expressed any opinion as to the guilt or innocence of the accused, when it appears from the affidavit of one Biggs, that he had previously formed and expressed a decided opinion, unfavorable to the prisoner, which fact was unknown to the prisoner or his Counsel until after the verdict was rendered.

When the motion for a new trial was made, this ground was supported alone by the oath of Biggs. And the Court refused to sustain it, because as the presiding Judge certifies, "it was affidavit against affidavit." Time was given until the next morning to offer additional proof, as to the incompetency

Epps *vs.* The State.

of Benedict, which not being produced, the motion was over-ruled—the Court being compelled to adjourn to reach Walton Court, which had been already postponed a day on account of this trial. *No application was made for further time to file additional evidence.* Two other depositions were subsequently obtained, after the case was finally disposed of and trans-mitted to this Court, with the remark by his Honor, Judge JACKSON, that the Solicitor General, residing in Lawrence-ville, had had no opportunity of procuring counter proof; nor had Benedict, the Juror, the opportunity of being heard in his defence. The Circuit Court has passed upon the case as it was originally presented, and we can only review his decis-ion. Whether the statements of Winfrey and Booth would have influenced him to award a different judgment, we have no means of determining. Of one thing we are fully con-vinced, namely: that there is no reason for attributing this verdict to passion or prejudice. For we very much doubt whether twelve men in the county could have been found, who would have rendered any other. This unfortunate man, not very bright at best, addicted to liquor and solitary in his hab-its, had suffered his spirit of resentment to engross his mind, until it had become almost a *monomania* with him; and thus possessed, he imbrues his hands, not in the blood of his broth-er, but of his father. Would that he were not only almost, but altogether, what his Counsel claim him to be, *doli inca-pax!*