No. 145.—JESSE COHRON, plaintiff in error, *vs.* THE STATE OF GEORGIA.

[1.] A casual remark made to or by a Juror, after he is sworn, to any person, in the presence of the Court, is not, of itself, necessarily suggestive of such an irregularity as will set aside the verdict.

[2.] The objection that a Juror is over sixty years, if tenable at all, is a disqualification which must be shown before he is sworn in chief, and is no ground for a new trial after verdict; especially if the fact was known to the defendant beforehand.

[3.] The charge of the Court should always be construed in reference to the facts of the case in which it is given.

[4.] Every killing is presumed to be felonious; and it is for the defendant, by proof, to justify or mitigate the homicide.

[5.] When the only testimony in a criminal case is the defendant's own confessions, while they are all admissible as evidence, it is for the Jury to weigh them and believe them or not, as they may consider them reasonable and probable, and in accordance with the truth of the case or otherwise.

Voluntary manslaughter, in Wilkes Superior Court. Tried before Judge JAMES THOMAS, September Term, 1856.

Upon the trial of this case, the following evidence was submitted to the Jury:

JOHN A. DOWNER sworn, says, that he got there a few minutes before deceased died. Prisoner asked Thomas Bolton if he could shave his son Jasper; deceased was about gasping his last breath when witness got there; this happened on 22d day of May, 1856, at Mallorysville in this county; witness knows nothing in regard to the killing.

Knows nothing of the killing; does not know that prisoner killed deceased; prisoner closed deceased's eyes; deceased gasped while prisoner was closing his eyes.

JAMES M. HAWKINS sworn, says, witness did not see the difficulty; about 9 o'clock at night Dr. Wootten sent for witness; when witness got to the house of prisoner he found it very bloody and deceased badly cut; this happened at Mal-

Cohron *vs.* The State.

lorysville, in this county, during the first of the last summer;. the house and piazza were covered with blood; prisoner was in piazza—his arm bleeding; deceased lay in the house; did not examine deceased that night; deceased seemed to be in great pain, and bled freely; there was much blood about: where deceased was lying; prisoner said his arm was cut;. witness conversed with prisoner, and prisoner said if it was to do over again he would do it; that he was not sorry for it witness judged from prisoner saying that he was not sorry; prisoner said, in answer to the question, if he was sorry, "no sir-ree Bob, if it was to do over I would do it again;" did not see prisoner shed any tears; prisoner was very light and laughing—did not seem at all sorry that night; prisoner did not laugh hearty; prisoner first said, when the affray commenced, he was sitting down whittling with his knife; that Jasper got to choking his mother or sister, and that prisoner could not stand that—and then he got up and the affray commenced; prisoner afterwards told witness, that when the affray begun he was lying on the bed by the door; Jasper came and attacked him on the bed and they went at it; does not recollect what prisoner said in relation to the interference of his wife and daughter; witness does not recollect any statement of prisoner as to what happened after the affray begun; witness stayed at house of prisoner till daylight next morning; thinks deceased died next day—did not see him die; witness left before deceased died; witness examined the house for blood that night; saw no blood in little. room; only saw it in big room and piazza, and plenty in the yard; deceased seemed to be in a dying condition when witness got there; witness thought he would die in a short time; witness saw no knives that night; some of the party looked about the house, but did not find any; saw two next day; did not see prisoner with knife; there was a good smart puddle of blood in yard by paling—not as much as half gallon.

Deceased was lying in room; prisoner was sitting in piazza—said his arm was cut; thinks prisoner was bloody—saw

blood on his arm—thinks it was left arm; witness never saw the wound at all; prisoner said it was that arm.

Witness testified, on committing trial: Prisoner said, in the same conversation about doing it over again, that he did it in self-defence—*always* said it was done in self-defence; witness looked at wounds on deceased—helped to dress him; wounds seemed broad and some small; some seemed cuts and some seemed to have gone in; can't say that all could have been made by same instrument—probably may have been; knew deceased; worked with witness six months; never saw him in violent passion; had seen deceased drunk, but not in a spree; witness was there when Dr. Anderson was; was with Dr. Anderson from 12 or 1 o'clock till witness left next morning; saw no blood in little room; did not examine it particularly that night; went in next day and saw none; did not look on the bed for blood; witness judged from deceased's clothes and bed-clothes, and his general appearance, that he had bled a great deal; there was blood on the left arm of prisoner; saw scratches on throat or face of prisoner—can't say which—may have been finger nail prints; prisoner said nothing about them to witness.

One or two wounds may have been 4 or 5 inches long; does not know of deceased's offering violence to any body; never saw him at it; there was a great deal of blood on the floor of the large room and piazza—scattered pretty much over piazza; saw prints of bloody fingers on railing of piazza; saw some blood on the chairs; saw four black places on the arm of deceased, above the elbow of the right arm; it looked as if it may have been done by the grasp of a hand.

The black places seemed more over than on the top of the arm—behind the middle part of the arm—separate and distinct black spots—probably an inch apart—fingers would have to have been separated to have made them; never saw deceased come into the shop in a rage; saw deceased stick his knife in the floor of the grocery and break it off.

UPSON R. EADS sworn, says, that he went to the house of the prisoner on the night that deceased was killed; heard

Cohron vs. The State.

some one screaming and ran there ; everything was in confu-
sion ; prisoner was sitting in piazza, leaning his arm on rail-
ing ; witness passed immediately through the house, and fol-
lowed Dr. Wootten to where he was lying ; deceased was ly-
ing in the yard by the palings—was lying rather on his left
side, with his head against the palings ; deceased was pros-
trated—means his strength—and not able to get up ; witness
ripped deceased's clothes loose to see where he was wounded
—only discovered one where he first opened the clothes ;
deceased was very bloody—great deal of blood about on the
ground ; witness and Dr. Wootten, Downer and Smith took
deceased in and laid him on the floor—very little blood in
the house—piazza very bloody ; some one asked prisoner
what was the matter ? prisoner replied that he believed he
had killed Jasper—was why witness went through ; observed
nothing peculiar in prisoner's manner, when he said he sup-
posed he had killed Jasper ; knew prisoner and deceased
some time before the death of deceased ; does not know their
comparative strength ; when witness and party went out,
prisoner pulled out a knife and said he had cut deceased with
that knife ; said he used little blade; knife exhibited is the
knife referred to by witness ; knife had as much blood on it
as could stick to it.

Saw a small streak of blood through large room where
prisoner walked through room or from prisoner—thinks he
saw prisoner walk there ; witness thinks it 8 or 9 o'clock
when he got there ; no one but family of prisoner was there
when witness got there ; saw wound on arm of prisoner. that
was on railing—a flesh wound of $\frac{3}{4}$ of an inch long—bled a
good deal—it was the left arm; wound could have been made
larger by the knife-blade exhibited, but not by a single stab ;
saw no other knife ; saw none on body of deceased—did not
examine his pockets ; heard prisoner say that if it was to do
over, he would do it again, because he had done it in self-
defence ; heard prisoner swear that night ; never saw him
cut up any shines ; did not know him intimately ; heard pris-

oner say that Jasper cut at or cut him first; does not remember that prisoner stated to witness how the affray began.

Did not see sister of deceased there when witness got there; she came afterwards, when prisoner swore he would be d—d if he would not do it again if it was to do over.

Dr. WILLIAM Q. ANDERSON sworn, says, that he was requested to visit deceased about the 22d of last May, in the morning; witness found deceased lying on a pallet on the floor; conceived deceased to be in a dying condition at the time; upon examination, witness found various wounds on the left arm, back, chest and abdomen; did not probe them; thinks he noticed 14 wounds—did not examine entire body; several of them, three or four, witness conceived to be fatal wounds; witness applied bandages to support the breast, while witness applied stimulants; two or three wounds reached the cavity of the chest, without penetrating the lungs; witness is a practising physician; was not there when deceased died; the wounds witness examined would inevitably produce death; prisoner stated to witness that deceased had attacked him in bed—choked him and cut him when in bed, and that prisoner's wife and daughter came to his assistance and caught hold of deceased, trying to get him away; from that deceased turned and pursued his daughter out of the house towards the front gate in the yard; that deceased returned to the house in the piazza; prisoner met deceased at the door from the piazza to the house, and that he took deceased's knife from him and cut him with it; witness saw no prints on deceased's arm.

Prisoner stated that he met deceased at the door and took deceased's knife away and cut him with it; next morning witness saw the knife exhibited; it had blood on the blade; witness is certain that prisoner said he took deceased's knife from him at the door; saw no wounds that penetrated the body less than half-inch wide; the wounds corresponded with the blade of the knife exhibited; witness stated, that that morning prisoner said he had done it entirely in self-defence —called witness' attention to prints on his throat, which

seemed to have been done as if he had been choked; witness was not in the presence of prisoner all the time till the knife was found or exhibited to witness; was not with the body of deceased all the time till the knife was shown to him; was at Dr. Wootten's probably two hours; saw no wound on prisoner's arm.

DAVID C. DOWNER sworn, says, he lives in Mallorysville; deceased and prisoner were drinking on the evening of the difficulty; deceased was drinking most; witness keeps a retail store; deceased told witness in the morning, that he would want spirits, and he would send prisoner after it; wanted a pint; got a pint twice that day for deceased; saw a knife shown by prisoner about 9 o'clock; after the affray prisoner said that was the knife he cut deceased with; the white handle knife exhibited was the one shown by prisoner; saw deceased with the other knife exhibited two or three days before the affray; searched and found the same knife in deceased's pocket.

Thinks deceased was very dissipated; can't say he is acquainted with the general character of deceased for violence; the large knife exhibited is the knife found in deceased's pocket; saw Mr. Smith take it from his pocket; some blood was on the blade when it was taken out; the white handle knife is the one prisoner said he cut deceased with.

The Court charged the Jury, among other things, that "if they believed that the father disarmed the son, and then gave the mortal blow, he is guilty of voluntary manslaughter."

This decision is assigned as error.

A new trial was moved—

1st. Because David Plumb, one of the Jurors, after having been sworn, left the jury box and walked about the court room unattended, conversing with various persons.

2d. Because one of the Jurors, David Plumb, was over 60 years of age, which fact was not known to prisoner's Counsel until after said Juror was sworn in chief.

3d. Because the Jury found against evidence.

In support of the first ground for a new trial, John H. Dy-

:son was sworn, and testified, that he saw David Plumb walking about the court room after having been sworn in chief; did not see him outside the bar; saw him go to the Judge and say something to him; he also stated he went to the Solicitor and tell him he was over age. The Court stated that this was the same communication made to the Court. Mr. Dyson also stated, he heard a man tell Juror he did not believe he was over age, from the looks of his head; did not see the Juror all the time he was out of the jury box; did not see him outside of the bar.

In support of the second ground for a new trial, the prisoner's Counsel expressed himself ready to produce his affidavit, swearing to his ignorance of the fact that the Juror, David Plumb, was over sixty years of age. This the Court deemed unnecessary, and decided that though both the prisoner and his Counsel were ignorant of this disqualification, it was not a good ground for a new trial. The Juror was exhibited to prisoner; he had a right, then, to put him on oath or on triors, as to his age; he did neither.

The Court refused a new trial, and this decision is assigned as error.

Fouche, for plaintiff in error.

Sol. Gen. Daniel, for the State.

*By the Court.*—Lumpkin, J. delivering the opinion.

Ought a new trial to have been granted in this case? We propose to examine the several grounds upon which it was asked.

[1.] Because one of the Jurors, David Plumb, after having been sworn in chief, left the Jury box, walking about the court-room unattended and conversing with various persons.

It seems from the evidence of Mr. Dyson, the Clerk, that Mr. Plumb did not go outside the bar. He remarked, perhaps in an undertone, to the Judge and Solicitor General, that

he was over age.   Some one observed that he did not believe
him from the looks of his hair;  the Juror wore a wig.

We think this exception fully covered by the case of *Epps
vs. The State*, (19 *Ga. Rep.* 602.)

The 9th assignment of error in that case was, "that Joseph
M. Williams, one of the Jurors, conversed with William
Wood and another Juror after they were sworn to try the
cause."   This transpired in open Court and in the presence
of the Judge; and the Court say: "With a crowded court-
room it is impossible to prevent some casual remark of this
sort.  A Juror is, unexpectedly to himself, sworn and put upon
the panel; he whispers to a friend some message to his fam-
ily, or gives some directions concerning his horse.   While
we condemn the practice, as no one should speak to the
Juror nor he to them without leave of the Court; still, no
case has been found which decides that this is such an irreg-
ularity as will entitle the prisoner to a new trial; such mis-
conduct as will require the verdict to be set aside."

We forbear to enlarge upon this point.

[2.] The next ground upon which the motion for a new
trial was made, was, that David Plumb, one of the Jurors
who tried the prisoner, was over sixty years of age, which
fact was not known to prisoner's Counsel until after said
Juror was sworn in chief.

It is not pretended that the defendant himself was ignor-
ant of the fact that David Plumb, the Juror, was over sixty
years of age.   We concur, however, with his Honor, Judge
THOMAS, that the objection came too late.   It is one of those
disqualifications, if, indeed, it be one, which should be in-
quired into before the Juror is sworn.   The Juror is exhibited
to the prisoner for that, amongst other purposes.   How easy
to get at the fact by propounding to the Juror himself the
question.   I have intimated a doubt, whether this be a dis-
qualification.   I know that the Act of February, 1856, pro-
fesses to define who are both *qualified* and liable to serve as
Jurors in criminal cases; and declares that all free white
male citizens who have arrived to the age of twenty-one years,

*and not over sixty,* and residents in the county where the trial is to be had, and not being idiots or lunatics, shall be *qualified* and liable to serve as Jurors upon the trial of all criminal cases.

Did that Statute intend to classify persons over three score years with infants, as having reached their second dotage? Nay worse—degrade them to the intellectual level of idiots and lunatics? Rampant and reckless as Young America may be, I can hardly believe that such was the meaning of the "reverend, grave and potent seniors" who enacted this law. Surely its reputed author did not design to commit *felo de se* by superannuating himself.

This *may* constitute a good objection, if taken in time. It can never be allowed as a sufficient ground to grant a new trial.

[3.] Again, it is said the Court misled the Jury and caused the conviction of the defendant, by erroneously charging them, that "if they believe from the testimony that the father disarmed the son and then gave the mortal wounds, that the accused was guilty of voluntary manslaughter."

The complaint is, that the facts thus supposed would constitute murder, and not manslaughter.

[4.] [5.] As an abstraction, the objection is well taken. If a father disarms an unoffending son—disarms and kills him, it is certainly murder. But the charge is given in view of the facts proven and fully warranted by the evidence. That the son was slain by the father, was not denied. In contemplation of law, the homicide was murder. And it was for the slayer, by proof, to relieve himself from this presumption, to reduce the offence from murder to manslaughter. And this he endeavored to do by the introduction of his own account of the transaction, as testified to by several witnesses. The statements were confused and somewhat contradictory. It was for the Jury to weigh and compare them, and to determine which narrative was the most reasonable and probable. The confession made to Dr. Anderson was, that the deceased "had attacked the prisoner in bed, choking and

Cohron *vs*. The State.

cutting him; that prisoner's wife and daughter came to his assistance and caught hold of deceased, trying to get him away; that he turned and pursued his daughter out of the house toward the front gate of the yard; that he came back to the house into the piazza; that prisoner met him at the door, took his knife from him and cut him with it. Witness saw the knife; the blade had blood upon it."

Now the instruction of the Court to the Jury was in reference to this statement, and was fully sustained by it. The Judge was justified in charging, and the Jury in finding, that the killing was without malice. And malice is an indispensable ingredient in the crime of murder. And this supercedes the necessity of considering the fourth and last ground, namely: that the verdict was contrary to evidence.

If the admission to Dr. Anderson was in accordance with the truth of the case, and the Jury had the right so to conclude, the verdict they rendered would be the judgment which the law would pronounce upon the testimony. The killing was voluntary, upon a sudden heat of passion, and without any mixture of deliberation whatever. It is to be hoped that the 22d of May, 1856, the day of this memorable tradegy, will long be recollected in the village of Mallorysville. Twice on that day, Mr. Downer swears that the father was sent by the son to procure spirits at his grocery—under the maddening influence of which, the hands of that father was imbrued in the lifeblood of that son !