64 453
113 4

64 453
119 446

64 453
121 449

64 453
123 434
123 435
e123 438

64 453
e125 313
e126 423

## HILL vs. STATE OF GEORGIA.

1. Remarks made by a juror before he had been impaneled indicating bias, may be explained by him, and if made simply for the purpose of avoiding jury duty, the fact that he was taken upon the jury which convicted defendant will not necessitate a new trial.

(a.) That one of the jurors in a criminal case conversed with his wife apart from the others, is no ground for new trial, where it appears that the conversation had no reference to the case, and was had with consent of defendant's counsel.

(b.) Objections to a juror propter defec um are too late after verdict.

(c.) A juror on being polled replied to the question "Is that your verdict?" "I agreed to it." This answer was objected to and the court again propounded it, when he said, "I agreed to it, I suppose." The court said that the juror was not asked for a supposition but for what the juror knows, "Is this your verdict or is it not?" The answer was "I suppose it is, if that is a proper answer to your question." "You are an intelligent man, Mr. Randall, please answer me?" "Yes, sir, I agreed to it," was then the answer. Thereupon the verdict was received over defendant's objection:

Held, that the verdict was properly received. Nor can the juror impeach it by subsequent affidavit.

2. The idea of prevention or defense against an impending or progressing wrong must enter into all cases of justifiable homicide. To deliberately kill in revenge for a past injury, however heinous, after reason has had time to resume its sway, cannot be justifiable.

(*a.*) The court charged that if Hill came upon Simmons suddenly and without premeditation, and his passions were aroused thereby, and in his (Hill's) belief, Simmons had a pistol, and enraged on seeing the adulterer for the first time after his knowledge of his guilt, he shot him and killed him, then the offense would not be murder, but manslaughter; but if the attack was premeditated and deliberate, and not upon a sudden burst of uncontrollable passion, then it would be murder.

*Held*, that the charge was right and warranted by the evidence.

(*b.*) As to the comparative weight of the evidence and the prisoner's statement, this case is controlled by the ruling in *Cox vs. State*, last term.

(*c.*) The charge was not argumentative or partial.

(*d.*) The constitution of 1877 does not alter the law in regard to the jury being judges of the law and fact in criminal cases. It simply re-enacts the provisions of the Code as they already stood, and emphasizes them by insertion in the fundamental law.

3. Newly discovered evidence which is merely cumulative to that introduced on the trial, not ground for new trial.

(*a.*) Insanity was not pleaded. Had it been the record does not show that the plea would have been sustained. If the defendant deliberately slew the deceased in revenge for adultery with his wife, he would not be protected by the fact that he labored under a delusion as to her character for virtue. If he is now a lunatic he can be removed to the asylum on proper proceedings had therefor.

4. The verdict is supported by the evidence.

Criminal law. Jury. Practice in the Superior Court. Charge of Court. Constitutional law. Husband and wife. Insanity. New trial. Before Judge HILLYER. Fulton Superior Court. March Term, 1879.

To the report contained in the decision it is only necessary to add the following:

Samuel H. Hill was tried for the murder of John R. Simmons. The evidence showed that Simmons was shaved in the barber-shop of the National Hotel, in Atlanta, and from there passed into the adjoining bar-room; that he took a drink of liquor, and while paying for it Hill came

up with a pistol, and with an oath which caused Simmons to turn, fired upon him; that Simmons died from the wound within a few hours, almost his last expression being that he was shot "for nothing in the world; he (Hill) shot me without saying a word." As to the exact expression used by Hill before he fired, the testimony and statement of the prisoner do not coincide exactly; as stated by him, Simmons placed his hand upon his hip, and Hill said, "Pull here, damn you, you've got to do it," and fired.

Thus far the conflict in the evidence amounts to little, but at this point the real contest begins. The defendant sought to show that Simmons was the seducer of his wife, and certainly established that he was a paramour of hers. It appears from the evidence that in December, 1878, she left home with Simmons, and remained from Saturday night until Monday afternoon at a bawdy-house; that Hill made diligent search for her, and at last recovered her through the instrumentality of a lewd woman, who communicated with Simmons, and through him caused her to return; that Hill condoned this offense, and removed her to a place some miles in the country; that on January 16th, 1879, Simmons was seen to pass and re-pass this place in a buggy, and about the same time a note was received by her, claimed to have been written by Simmons in a disguised hand; that she wrote an urgent letter to her husband telling him to come to her, but assigning no reason; that he went, and about the end of January the homicide occurred. There was much evidence for the defense to show the anguish of Hill, his excitement, and that he made numerous inquiries about his wife, Simmons, etc.

The state replied and supported its position with the testimony of numerous witnesses, that Mrs. Hill had left the path of virtue long before she met Simmons; that she met him in the company of harlots under the assumed name of "Miss Effie Etheridge," and received his attentions as such; that she visited balls and houses of bad character both with Simmons and other men; and that in most if not all

respects her actions were those of a common woman of loose character. It appears that Simmons discovered that she was a married woman, but at what time does not appear.

There was some testimony tending to show that before the homicide Simmons anticipated a difficulty, and was prepared for it, or at least had spoken of being armed for such an emergency.

Of Hill's love for his wife and the genuineness of his anguish at her fall there seems to be no doubt. How far his knowledge of her real degradation extended before the killing was a point in contest. One witness for the state indicated that he knew of her immorality, others that he was informed of her attendance at improper balls with other men than Simmons, but the main reliance of the state on this subject was the following portion of defendant's statement: " John Simmons accomplished what he had before, and this is what she tells me of it; has told me all the time, and it is John Simmons all the time. G. tried to do so himself, · but Simmons told her G. was diseased, and he would have accomplished his purpose but for that; and I state this to show you what he done, and that he was not so much to blame, and that is the reason I didn't kill him."

The court delivered the following charge :

"*Gentlemen of the Jury:*

"The court will now deliver to you the law for your guidance and direction in reaching a verdict according to the evidence.

"The court will not express or intimate any opinion touching the evidence or facts in issue. The court delivers to you the law with care and upon great consideration, and you may safely rely upon its correctness as the court delivers it. It is your exclusive province to find the facts in the evidence. You judge the law and the facts, and they lead you to the truth.

" I now read you certain sections of the Code pertinent to the case, and to which I invite your careful attention.

" Sections 4292, 4293, 4319, 4320, 4321, 4322, 4323, as amended by act of 1878, 4324, 4325, 4327, 4330, 4331, 4332, 4333, 4334, 4335.

" If you find from the evidence that the prisoner at the bar did, in the peace of the state, in this county, on the occasion, with the weapon'

and in the manner described and set out in the indictment, with malice aforethought, either express or implied, unlawfully kill the deceased, John R. Simmons, and if the prisoner was then and there a person of sound memory and discretion, the offense of murder would be made out; otherwise the offense of murder would not be made out.

" A person would be presumed to intend the natural consequences of his acts. A person would be presumed of sound memory and discretion unless the contrary appear.

" By our law homicide is of three kinds—murder, manslaughter and justifiable homicide—and it is not every killing of another that is unlawful. But if it appear that the prisoner was the slayer, then the law would cast on him the burden of proof to show that such killing was justifiable; he must show clearly that there was an actual necessity for the killing in order to prevent some grievous injury, such as those expressly laid down in the Code, or such other or others as may in the opinion of the jury stand on the same footing of reason and justice as those enumerated.

" To constitute either murder or manslaughter the killing must have been unlawful, for if the killing is justified the law of our state declares that the person accused shall on his trial be fully acquitted and discharged.

" If a man and his wife be living together in the holy bonds of matrimony, and in virtue and in peace, and another man should become the seducer of such woman, or an adulterer with her, or should attempt to do so, her husband would have the right to defend her and to defend himself from such injury, and to use just so much force as under the circumstances was necessary for that defense, and to make it effectual and complete. The penal Code enumerates certain instances of justifiable homicide, and then in section 4334 sets forth this general provision: 'All other instances which stand on the same footing of reason and justice as those enumerated, shall be justifiable homicide.' You notice in listening to these various sections of the Code read in your hearing, that one of the principles of reason and justice on which a homicide can be justified is this: that such homicide was committed as a defense against an injury—to prevent an injury of the serious kind described—or to stay its progress. There is no principle of reason or justice enumerated in the Code by which, after an injury shall have been consummated, no matter how great and no matter how grievous that injury may be, the party injured would be justified in taking vengeance into his own hands and in deliberately seeking out the wrong-doer and slaying him. The law would continually thunder its imperative command in the ears of the one thus outraged and tempted: ' Thou shalt not commit murder!' One of the very reasons why the law visits such terrible punishment on the crime of murder is because of the greatness of the temptation, the provocation, and the passions which sometimes lead to its commission. Punishment is in-

tended to overcome such passions and deter men from the crime; and the existence of such temptations, provocations, or passions, if such there be, might be looked to for ascertaining motives, or to inquire whether the killing was intential or malicious, but would afford no justification for the killing if perpetrated for the mere purpose of vengeance, punishment, or vindication.

" A man would have the right, nay it would be his duty, to protect and defend his wife against any assault upon her virtue by either a seducer or an adulterer. In this state the husband is the head of the family; the wife is subject to him; her legal civil existence is merged in the husband, except so far as the law recognizes her separately either for her own protection or for her benefit, or for the preservation of public order—Code, section 1753. And it would be the duty of a wife to conform to any reasonable and just regulations the husband may lay down for guiding her conduct or choosing her associates—and it would be the duty of all other persons to acquiesce in the husband's authority or directions, so far as known in respect thereto, and if any man should violate this principle for the purpose of adultery, or seduction, and by open force or deceit, or fraud, come between husband and wife, the husband would have a right immediately and swiftly to resort to force for the expulsion of such intruder, and, as before stated, to use just so much force as was necessary, and even to slay the aggressor, if such killing should be actually necessary in order to protect and defend his wife. But if a man's wife be permitted to go, or does go, into haunts or walks of vice, and becomes an adulteress with one man, or more than one man, and though her husband knew nothing of such misconduct, yet when he finds it out, if he goes to her rescue, seeks and accomplishes her complete restoration to him and condones her offense, and there is no further necessity for violence in her defense, or in his defense, he would have no right afterwards deliberately, and with premeditation, to arm himself with a deadly weapon and seek out her paramour, if there was but one, or to select among them, if more than one, and to slay him with that weapon, and if he do so after the lapse of cooling time, that is, after the lapse of an interval sufficient for the voice of reason and humanity to be heard, his offense would be murder. The party injured would not be justified in taking the law into his own hands, and, in the chambers of his own mind, judge and condemn such offender to punishment by death, and then deliberately become also his excutioner. The law provides other and juster means for putting men on trial, and for condemning and punishing offenders. And any man who should thus take the law into his own hands, and with such purpose and intent, slay another, would thereby become a murderer.

" Look to the evidence and see what was the state of things when the killing occurred. If at that time the prisoner's wife was in safety some miles distant at her home in another county, in the society of her

Hill *vs.* The State.

friends, and the deceased was then and at that time engaged in making no attack of any kind on her, either by open force or fraud or deceit, or even though deceased had some days or a few weeks previously endeavored to persuade her to meet him by writing her a note, or sending her a message, or otherwise, still, if practically she was on that day and at that time in safety, and there was no necessity pressing upon the prisoner to adopt then and there so dreadful an expedient as taking away life in order to defend either himself or her, then no motive of vengeance or anger, nor any other motive based on such past offenses, would justify the killing. No matter how badly the deceased and others may have acted days or weeks before, and no matter how just the prisoner's anger may have been for previous injury or grievances; still, if that anger rested exclusively on past occurrences; if at that time the deceased was saying nothing and doing nothing in furtherance of any criminal project, such past occurrences would afford no justification; nor would a bare fear of any repetition of offenses, or of an attempt thereat, justify the killing. The prisoner would have a right, if he chose so to do, to condone her offenses and to continue to live with her, and the law would protect him and her therein; and if he apprehended any further invasion of his peace, he would have the right to take precautionary measures and be on the alert, and if such further attempt should be made, to meet it with any force reasonably needful to repel and to overcome such invasion or to cut it short. But if, disregarding his duty and deaf to the voice of reason and humanity, he, after an interval of time sufficient for that voice to be heard, take the law into his own hands and slay the deceased through mere anger for past offenses, this would come within the definition of deliberate revenge, and would constitute express malice.

"The supreme court has never decided that such a killing would be justified. That court has held, just as this court now holds, that a man may in good faith defend his wife's person and his wife's virtue on the same principles of reason and justice as he may defend his own person; but that he may not take the law in his own hands and deliberately avenge unto death a past and accomplished adultery in the manner or after the time claimed in the argument.

"The court states to you the law clearly. You are plain, honest men, seeking the truth and desiring to do right. The court is your safe and reliable constitutional adviser as touching the law. You have the right to receive the law as the practiced and trained mind of a sworn judge knows it to be, and I would be unfaithful if I fail to deliver it plainly.

"Take no heed of anything read or spoken to you to the contrary hereof. Courts and juries cannot—nay, dare not—swerve from the truth in the law any more than in the facts. If any other jury has ever found, as in your hearing claimed, that in any case a man has the right to take the law into his own hands and be justified to execute

vengeance unto death, this would rather cause such juries to be noted for their weakness or their wickedness, but would be no precedent or example for you.

" So far as anything may have been said in your hearing to the contrary of what the court announces to you on the point in question, when reduced to its ultimate analysis it simply amounts to the proposition that the law is wrong. The law is not wrong. But if it was wrong, neither you nor the court could change it.

"The course taken in the argument renders it proper for the court to remind you that the law lays down general rules applicable to all. The law is made for the whole state, white and black, old and young, good and bad, all alike. What would justify one in the court-house would under the same circumstances and motives justify another. Courts and juries can be no respecters of persons, and if there be that of right reason, which makes it proper to withhold punishment in any particular case where the letter of the law has been violated, the wise and humane provisions of the constitution and laws of our state would not therefore ask a court and jury to swerve from the truth in the law, but would authorize application to that power in the state capital, where is vested the right to grant reprieves and pardons. I caution you carefully that you must not convict or move one iota towards consenting to a conviction or any idea or supposition relative to pardon, but I mention it to you merely to disabuse your minds and to let you see how you may justly and wisely discriminate between such logic and argument as may aid in leading you to the truth in the law, and such appeals to feeling or based on any alleged exceptional nature of the case as are out of place when addressed to you, but should be addressed, if need be, to another department of the state government, having a wider discretion than any which exists in the judicial department.

"If the jury should be satisfied, after a careful consideration of all the evidence, that the deceased, John R. Simmons, had had, without defendant's knowledge, criminal intercourse with defendant's wife, and after this fact came to defendant's knowledge he should casually meet the deceased, without having sought him, and without any purpose to attack him with a deadly weapon, but being brought unexpectedly face to face with him, and believing that deceased was armed and expecting to fight him, the prisoner's passion should be aroused anew and was sudden, violent and ungovernable, and without any mixture of deliberation whatever, and if under the influence of such passion and upon such sudden occasion the prisoner fired on deceased, his offense would be voluntary manslaughter, and not murder. But you will observe, as before stated, that if there was premeditation and cooling time, and if the prisoner had sought and found deceased with an intention to kill him or with a preconceived intention to bring on a fight with deadly weapons, the law would not thus grade such offense from murder down to manslaughter.

"If the prisoner killed the deceased in self defense, or if the prisoner killed the deceased in defense of his wife's virtue against an attempt then and there being made on the same, and actually in progress, and under such circumstances as that such killing was actually and absolutely necessary to prevent such injury, and under such circumstances as to constitute an instance standing on the same footing of reason and justice as those of justifiable homicide, enumerated in the Code, you would be authorized to find him justifiable, and should acquit him. But, as before stated, if at that time his wife was in a place of safety, and was actually safe, the prisoner would not be thus justified; or if you should find, in view of all the evidence, that such killing does not constitute an instance standing on the same footing of reason and justice as those of justifiable homicide enumerated in the Code, he would not be justifiable.

. . . . . . . . .

"Whether there was an interval sufficient for the voice of reason and humanity to be heard, is a question for you to determine. Each case depends on its own peculiar facts, and it is for you to say whether, under the peculiar facts of this case, there was here an interval sufficient for the voice of reason and humanity to be heard.

"The greatness of a provocation and other circumstances are to be duly considered in determining the question, but the principle should not be unreasonably extended.

"The law does not prescribe any particular duration of time in which an intention unlawfully to take life, or to do a criminal act resulting in death, shall subsist in the mind in order to constitute malice. There must be deliberation in order to make express malice—that is, a succession in mental action, the unlawful intention—and then following after the formation of that intention, the execution or carrying out of the same. If there was time for deliberation; if there was an interval between the assault or provocation given and the homicide sufficient for the voice of reason and humanity to be heard, under the circumstances, in the conscience of a reasonable man, then it would be the duty of the prisoner to hear that voice; and if he had, and persisted in, an unlawful purpose to kill through or during such an interval, there would be express malice; but if there was not such sufficient interval, there could be no express malice.

"The effect of an absence of express malice or cooling time, if all the other conditions of guilt appear or be made out in proof, would be, not to justify the prisoner, but to reduce the offense to manslaughter."

. . . . . . . . .

The judge then charged in the usual terms upon the questions of reasonable doubt, impeachment of witnesses, the prisoner's statement, and the form of the verdict.

The jury found the defendant guilty of murder, and recommended that he be imprisoned for life. He moved for a new trial, which was refused, and he excepted.

In connection with the second division of the decision, subdivision (*d*), it is only necessary to add that the court refused to charge, at the request of defendant's counsel, that "by virtue of the constitution of 1877, the jury in this case are the judges of the law as well as of the facts."

In connection with the third division, subdivision (*a*), of the decision, it may be stated that one of the grounds of the motion for new trial was because the defendant was insane at the time of the killing, and had been so ever since. This ground was supported by affidavits tending to show emotional insanity; that the especial form in which this insanity exhibited itself was in his social relations, and particularly in his absolute belief in the purity of his wife and in the fact that she had been greatly wronged—and that, too, after hearing all the evidence in the case.

For the other facts see the decision.

GARTRELL & WRIGHT; R. S. JEFFERIES; HOPKINS & GLENN; W. BRAY; W. T. MOYERS, for plaintiff in error.

B. H. HILL, Jr., solicitor general; HOKE SMITH; J. C. JONES; E. ROCH, for the state.

JACKSON, Justice.

The defendant was indicted for the murder of John R. Simmons in the city of Atlanta on the 29th day of January, 1879; he was found guilty, and made a motion for a new trial; the presiding judge overruled the motion on all the grounds therein stated, and error is assigned in this court on each of these grounds.

The question before us is, did the presiding judge so err on any of these grounds as to authorize this court to set aside the verdict of the jury and order a new trial, notwithstanding the approval by the judge who tried the case of the verdict rendered by the jury? This is a court of law. The questions made by this record are pure questions of law. With the policy of the law we have nothing to do. It is our duty to enforce it as we find it written. Sympa-

thy for the. dead, slain in the flower of youth, and sentiment for the living, who slew him under circumstances which appeal to all hearts for kindness and consideration, must both be repressed, and impartial justice according to law must reign here, and reign alone.

Anxious to guard every right of the defendant on the one hand, and to vindicate the serene and sober majesty of law on the other, we have scrutinized closely every line of this voluminous record of more than five hundred pages, and have examined the entire case with that care and deliberation which its importance to the defendant and to society demands. The conclusions reached are the result of much time devoted to the case and much anxiety to discover truth and to apply the principles of law to the truth disclosed by the evidence set out in the record. Questions in dispute in regard to the law are to be found in the motion for a new trial, and to the consideration of these questions we address ourselves.

When analyzed, the grounds taken in the motion for a new trial may be classified under four heads : first, alleged errors of the court below in respect to the jury ; secondly, in the charge to the jury ; thirdly, in regard to newly discovered testimony ; and fourthly, in upholding the verdict as authorized by the law and the evidence.

1. In respect to errors of the court in overruling the motion for a new trial on the several grounds touching the conduct of the jury, it is assigned as error first, that a new trial should have been granted because Myers, one of the jury, had formed and expressed an opinion on the guilt of the defendant prior to the trial, and was thereby disqualified.

This assignment of error rests on the following affidavit of J. B. Redwine, Esq.: " . . . I asked him where he was going. He answered he was summoned as a juror in the Hill case to be called that day, but added that they wouldn't take him, or that he knew he wouldn't serve, as he had already made up his mind as to what he would do.

I then asked him how his mind was made up, for or against Hill; he refused to answer. I then put the substance of the statutory questions, and he said he could not answer all of them rightly. I inferred he was prejudiced one way or the other. I was engaged at the time and do not recollect distinctly all that occurred after this. I know I asked him if he knew John R. Simmons and Sam. Hill. I know he replied he knew one and not the other; which one he knew I cannot distinctly recollect, but the impression on my mind now is, and has since been, that he knew Simmons and not Hill. From his manner and from what he said (of course I cannot recollect all) I received the impression that he was prejudiced against Hill. William M. Turner, my office boy, was present at the time."

If this affidavit had not been explained, it would be too vague and uncertain to predicate a reversal of the judgment upon it; but it is answered by the juror in a deposition made by him, who swears positively that the conversation had with Redwine was to induce the impression that he had made up his mind so as to get out the report and enable him to keep off the jury, and further, that he had made up no opinion whatever but was perfectly impartial. Besides, it further appears from the record that this juror was one of the last two to concur in the verdict, and has made a deposition in behalf of defendant on which newly discovered testimony is predicated; 59 *Ga.*, 308, covers the point completely.

(*a.*) It is also insisted that Rich, one of the jurors, conversed with his wife apart from the other jurors pending the trial; but that conversation had no reference at all to the case as shown by the depositions of Rich, the juror, and of the bailiffs in charge of the jury. Moreover, it seems that counsel for the defendant assented to the permission given by the court that such conversation should be had, and so the judge distinctly certifies. 45 *Ga.*, 282; 47 *Ib.*, 598.

(*b*). Further, it is objected that since the verdict it has been ascertained that Rich is an unnaturalized foreigner.

There is no doubt that Rich was born in Hungary. Whether ever naturalized or not appears somewhat doubtful from the record. The *onus* is on the defendant to show that he is not a citizen, especially after verdict. Rich thought that he was naturalized in Albany, and took an oath there on which he voted some years ago. He has been in the United States ever since he was thirteen years of age, and his father ever since 1868. He may or may not have been naturalized; possibly he was. Revised Code U. S., §2167.

Be that as it may, the objection comes too late. In *Cortz vs. The State*, 19 *Ga.*, 628, a case of homicide, this principle was ruled, and also in *Epps vs. The State*, 19 *Ga.*, 102. It is a challenge *propter defectum*, and must be taken before verdict. See also 40 *Ga.*, 253; 3d Blacks. Com., 361; 20 *Ga.*, 752; 28 *Ga*, 439; 33 *Ga.*, 403; 39 *Ga.*, 118; 47 *Ga.*, 538; 53 *Ga.*, 428; 57 *Ga.*, 329; 60 *Ga.*, 55, cited by defendant in error.

(c.) It is also objected that Randall, one of the jurors, when that body was polled, did not signify his assent to the verdict as required by law. Randall replied to the question, "is that your verdict?" "I agreed to it." This answer was objected to, and the court again propounded it, when he said, "I agreed to it, I suppose." The court said that the juror was not asked for a supposition, but for what the juror knows. "Is this your verdict or is it not?" The answer was, "I suppose it is, if that is a proper answer to your question." "You are an intelligent man, Mr. Randall; please answer me?" "Yes, sir, I agreed to it," was the answer. And thereupon the verdict was received over defendant's objection.

The practice is not uniform in the United States on polling the jury. In some states it is not allowed; in others it rests in the discretion of the judge, and at common law it seems to have existed in another form—2 Hale's P. C., 299; Bishop's Crim. Pro., 830; 1 Chitty, 635. In this state the right is recognized, the object being to ascertain before the

public and prisoner whether the verdict agreed on in the jury room is still the unanimous verdict of the jury—31 *Ga.*, 641-661; *Campbell & Jones vs. Murray*, August 7, 1878, not yet reported. The question is, did the juror still assent thereto? From the narrative above given, the presiding judge held that he did, and we think that, whilst the juror hesitated, yet he then and there assented and recognized the verdict as his.

The affidavit afterwards taken by him cannot be considered—Bishop's Crim. Pro., 830. He cannot impeach the verdict after its record—17 *Ga.*, 146; 9 *Ga.*, 121; 49 *Ga.*, 622; 59 *Ga.*, 309.

Indeed, the first answer of the juror, if not sufficient of itself to show present assent, without any other questions or answers, was made plain by the last "yes, sir, I agreed to it;" as much as to say, "yes, sir, it is my verdict, for I agreed to it." The case in 6 Wisconsin, cited by plaintiff in error, is much stronger than this. It shows almost conclusively dissent to the verdict.

2. We come now to consider the errors assigned upon the charge and refusals to charge.

The portions of the charge excepted to seem to have been cut in segments from the body of the charge. Without stopping, however, to see whether the whole segment embodies more than one point, and whether in that view any of them can be reviewed under the rulings of this court in similar cases if strictly applied, let us analyze them to see what real points are relied on, as well as we may, from the wholesale manner in which they are presented.

The main point made, as it strikes us, is that the court did not fairly submit to the jury section 4,334 of the Code, which enacts that "all other instances which stand on the same footing of reason and justice as those enumerated, shall be justifiable homicide." Defendant insists that the court should have turned the jury loose upon this section, and should have instructed them that, "where a man kills another for having criminal intercourse with his wife, it is

for the jury to decide whether the killing stands upon the same grounds of reason and justice as those enumerated in the Code, and if they so believe, it would be a case of justifiable homicide." The judge declined to give this request, but instructed the jury that "there is no principle of reason or justice enumerated in the Code by which, after an injury shall have been consummated, no matter how great and no matter how grievous that injury may be, the party injured would be justified in taking vengeance into his own hards and in deliberately seeking out the wrong doer and slaying him;" that "the existence of such temptations, provocations or passions, might be looked to for ascertaining motives, or to inquire whether the killing was intentional or malicious, but would afford no justification for the killing if perpetrated for the mere purpose of vengeance, punishment, or vindication;" that "one of the principles of reason and justice on which a homicide can be justified is this: that such homicide was committed as a defense against an injury, to prevent an injury of the serious kind described, or to stay its progress."

So that the issue is plainly presented, whether homicide to be justifiable must be in defense of wrong or to prevent its consummation—in the language of the judge, " to stay its progress"—and whether if committed for a past wrong, distant enough for prisoner to cool—even adultery with the slayer's wife—the killing is justifiable in law.

The question turns on our Code. What are the previous sections referred to in section 4334? They are sections 4330, 4331, 4332 and 4333; and so far as at all applicable here they read as follows in giving the instances of justifiable homicide: " In self-defense, or in defense of habitation, person or property, against one who manifestly intends, or endeavors, by violence or surprise, to commit a felony on either; or against any persons who manifestly intend and endeavor, in a riotous and tumultuous manner, to enter the habitation of another for the purpose of assaulting or offering personal violence to any person dwelling or being

therein.  A bare fear of any of those offenses, to prevent
which the homicide is alleged to have been committed, shall
not be sufficient to justify the killing.  It must appear that
the circumstances were sufficient to excite the fears of a
reasonable man, and that the party killing really acted under
the influence of those fears and not in a spirit of revenge.
If, after persuasion, remonstrance, or other gentle measures
used, a forcible attack and invasion on the property or
habitation of another cannot be prevented, it shall be justi-
fiable homicide to kill the person so forcibly attacking and
invading the property or habitation of another; but it must
appear that such killing was absolutely necessary to prevent
such attack and invasion, and that a serious injury was in-
tended, or might accrue to the person, property or family
of the person killing.  If a person kill another in his de-
fense, it must appear that the danger was so urgent and
pressing at the time of the killing, that in order to save his
own life, the killing of the other was absolutely necessary;
and it must appear, also, that the person killed was the as-
sailant, or that the slayer had really and in good faith en-
deavored to decline any further struggle before the mortal
blow was given."

These are the enumerated instances where one may kill
another and be justified in doing so; and the legal question
is, does the principle of defense, defense of some sort, enter
into them all? and can any case stand on the same footing
of reason and justice as these enumerated cases do, unless
defense of some sort—the prevention of some impending
and pressing wrong—enters as an element therein?  Judge
Hillyer charged that defense against some urgent and press-
ing danger must have operated on the mind of the defend-
ant, or he was not justifiable; or, to put the question on
the case at bar, he charged, in effect, that defendant must
have killed Simmons to prevent him from attempting or
consummating an impending adultery with his wife, and
not to avenge a past adultery with her, in order to justify
the killing.  Mark, the question now is not the reduction

of the crime from murder to manslaughter, but the abso-
lute and unconditional justification of the killing; in other
words, that such killing is no offense at all.

It will be seen by merely glancing at the quotations from
the Code of the enumerated cases of justifiable homicide,
that each of them contemplates defense against immediate
and pressing danger. It is defense of self; it is defense of
habitation, property or person; it is defense against one
who manifestly intends or endeavors, by violence or sur-
prise, to commit a felony on either; it is defense against a
mob violently and riotously intending and endeavoring to
enter one's house to assault or wrong some person therein;
it is defense against real, imminent, impending danger;
a mere fear of any offense, to prevent which the killing is
done, shall not justify it; the circumstances must be such
as to excite reasonable fears in a rational mind, and the
person killing must act under the influence of such fears,
and not in a spirit of revenge; not only must it be in de-
fense, but it must be absolutely necessary to prevent the
attack or invasion; and even in self-defense, the strongest
of all defenses, the danger must be so urgent and pressing
at the time of the killing, that in order to save one's own
life, the killing was absolutely necessary.

So that our law broadly separates the act of deliberately
seeking another and slaying him for past wrongs, however
heinous they may be, from the act of slaying another to
prevent his doing a present wrong, or future wrong immi-
nently impending. Whenever done to avenge the past, it
is not justifiable; when done under pressing necessity to
defend life, or limb, or wife, or child, or habitation, or
property, against felonious attack on either, it is justifiable.

Therefore, our law, in common with the laws of all civil-
ized states with which we are acquainted, forbids vengeance
for the past, but permits defense against the present and
the immediate and pressing future; and therefore the pre-
siding judge did not err in the refusal of the request to
charge, or in the charge given on this point.

(*a*). And this, we think, disposes of the eight first grounds of this motion.  Some criticism is made in regard to the allusion in the charge to the pardoning power and where it is lodged, to the caution of the judge to the jury not to take law from counsel in the teeth of the exposition given by the court, to the allusion to man and wife living in virtue and peace, to the argumentative tendency of the charge, and to other such matters ; but in the eight grounds reviewed, we see no substantial errors in matters of that sort, or in other respects.

In one of them, exception is taken to the judge's exposition of the law of manslaughter as contradistinguished from murder, and the application of that law to this case.  The court told the jury, substantially, that if Hill came upon Simmons suddenly and without premeditation, and his passions were aroused thereby, and in his (Hill's) belief Simmons had a pistol, and enraged on seeing the adulterer for the first time, after his knowledge of his guilt, he shot him and killed him, then the offense would not be murder, but manslaughter; but if the attack was premeditated and deliberate, and not upon a sudden burst of uncontrollable passion, then it would be murder. Such we understand to be the law ; and as Hill's exclamation when he shot implied that he thought Simmons had a pistol, the allusion to the prisoner's belief that he did have one is not without evidence to support it.

(*b*). In respect to the comparative weight of the evidence and the statement, the charge is identical with that given in the case of *Cox vs. The State*, decided last term, and is controlled thereby.  So the ninth ground is not good.

(*c*). Nor do we think that the charge is partial, or argumentative, or that it intimated any opinion on the facts.  It is forcible and strong, clear and to the point; it gave the law of the case to the jury, but only the law.  More it did not do ; less it ought not to have done.  The tenth ground is not, therefore, sound.

(*d*). The constitution of 1877 does not alter the law in

regard to the right of the jury to be the judges of it independently of the instructions of the court thereon. It simply re-enacts, in identical language, the provisions of the Code thereon. It emphasizes it by inserting it in the constitution; but it put it there subject to the construction which had been put on the same words in the Code. Had the convention of 1877 intended to change the construction of those words, it would have altered them. On the contrary, as we understand it, it expressly declined to do so.

Therefore the court was right to refuse the request embodied in the twelfth ground, and the eleventh was passed upon with the first eight grounds.

3. So we come to the newly discovered testimony, or the grounds set out in the amendment to the motion. That in regard to the competency of Rich as a juror has been already considered. That of Myers in respect to the letter written to Mrs. Hill and its authorship by Simmons, is merely cumulative, and would not probably change the verdict if the law is administered, because, if Simmons did write it, it was nearly two weeks prior to the killing, and did not, and could not, take the case without the rule that to reduce the homicide from murder to manslaughter, there must not be time for passion to cool and reason to resume her sway over hot anger and sudden fury.

(*a.*) The counsel on the trial before the jury differed in respect to putting in evidence of insanity, and decided not to do so. The plea, if it had been put in, would not have been supported by the evidence. If the defendant rested under a delusion in regard to his wife's virtue, and therefore slew the deceased, it would not protect him in the commission of the crime—31 *Ga.*, 479.

If he be now a lunatic, he cannot be hurt. He ought to be, and will be, removed from the penitentiary to the asylum. The same lunacy might induce him to slay others for a like offense with that for which Simmons lies in his grave. Confinement somewhere may be essential to prevent the repetition of the deed on another.

4. Is this verdict supported by the evidence and is the defendant guilty of murder? The evidence shows deliberate revenge. The wrong was a grievous wrong, but the vengeance therefor was conned over and calculated for weeks. The prisoner's statement alone, stripped of all inferiority to evidence, and admitted to be the whole truth, shows a case of deliberate murder. Hence the last refuge of counsel, the change of base, the desire to set up the plea of insanity on a new hearing.

But what are the facts? The wife of Hill was introduced to Simmons as a lewd woman, and in company with lewd women; as a single woman and not a married woman; as Miss Etheridge and not Mrs. Hill. She was introduced without his seeking her. One of her companions in sin sent for him. He took her for a woman of the town, and so he had cause to believe her to be from her company and conduct. The record shows that she had been enticed from allegiance to her husband—if indeed her own disposition needed seductive influences to lead her astray—weeks, if not months, before Simmons knew her. He met her thereafter at balls where virtuous women did not go, and at places to name which chastity would blush. He did discover that she was a married woman and was Hill's wife, but at what point of time during their intimacy the record does not show. When he made that discovery, he should have stopped that wild career of sin, which he seems to have entered under the lead of married men; but he did not. On the 8th of December, 1878, in company with another man and with Simmons, she left home, and her husband, about whose affection for her and anguish at her departure there can be no doubt, recovered her within three days through the instrumentality of a lewd woman and her knowledge that Simmons knew her lodging, and who seems to have induced her return to Hill.

Her husband condoned the past guilt of his wife, as he had the right to do, and restored her to his home. He moved her to the country, eight miles from Atlanta, and

about the 16th of January, Simmons was seen to pass and repass once that country place in a buggy, and about the same time a note was received by her said to be written by him, but in a disguised hand, and Hill received a letter from her begging him to come to her, but without stating any particular reason. Thenceforward Hill seems to have deliberately intended to wipe out his wrongs in the blood of Simmons, and thirteen days thereafter, on the 29th of January, just after Simmons had been shaved in the barber's shop of the National Hotel, and was at the counter of the bar-room, about to settle for a drink he had taken, Hill stepped up behind him, and with some profane or vulgar exclamation prefixed to the remark, "shoot, you've got it to do," as Simmons turned to see what or who it was, shot him through the face and head, and about the last exclamation of the dying man was, "he shot me for nothing!"

The dead man had no chance for his life. Hill may have thought Simmons was armed and from his exclamation it seems that he did think so; but Simmons had no weapon drawn and was allowed no time to draw one if he had it. If this be not murder what can make a case of murder, wherever in the past there has been great provocation? Hill in his statement admits the killing for revenge and puts his defense there. He says that he would have killed another paramour of his wife, but that he was not so guilty as Simmons. The legal question, and with that question only it is our duty to deal, is narrowed, therefore, to this: Is a man justifiable in deliberately hunting down another who committed adultery with his wife nearly two months before the homicide, and thirteen days before rode past the house where she was and wrote to her about the same time, and in deliberately shooting him down without a moment's time for defense, when he knew at the time of the killing that the wife had left his home and that others were guilty also, though not so much so in his opinion? or do these facts reduce the homicide to voluntary manslaughter?

There cannot be found a case in any law book with

which we are familiar that approximates such a conclusion. It is only where the danger is so imminent and immediate that one cannot appeal to the law for help, that in civilized society he can help himself.

It is true that where virtuous wives or sisters or daughters are insulted, jurors are slow to convict the avenger of the affront, though time enough had elapsed to put passion under the sway of reason ; but even in such cases no court has ever held or can hold, without becoming instead of expounders makers of the law, that such verdicts are in accordance with the law.  The Augusta case of shooting at another, in our own reports, is wholly unlike this.  There no breath of suspicion soiled the purity of the wife.  The very evening before, the affront was given ; and the insulter, the very next morning at breakfast, had the audacity to take his seat at the same table and immediately in front of the insulted woman and the guardian of her virtue ; and it was in that case that this court ruled that the jury might consider whether it stood on the same ground of reason as the cases enumerated in the Code.  The wife was not only pure, but present ; passion, just kindled the night before, flamed up beyond control at the sight of the aggressor, who was not hunted down to be slain, but who obtruded his presence before those he had wronged.

In this case Mrs. Hill was safe eight miles in the country ; and while thus safe, Simmons was sought, was found, and was slain without a moment's warning.

We forbear to detail further the facts of this case made by this record.  We would not unveil the folly and frailty of the unhappy woman, whose conduct has robbed her husband of home and of liberty, and one of her paramours of life ; nor would we expose the haunts of vice uncovered by this evidence, and the men who frequent them.  We add but a single remark : If men will take the law into their own hands, become themselves the judges of their own cases, and their own sheriff to execute the sentence they themselves pronounce, they must be certain that they judge the

case according to law and execute the sentence which that law pronounces, or they must suffer the consequences of their mistake of the law. Homicide for revenge of past offenses, however heinous, deliberately planned and premeditated, and carried into execution after reason has had time to assert her supremacy over passion, is murder; and he who judges that in his own case it is not, and executes sentence in such a case on a fellow-being, must suffer the penalty which the law imposes upon the murderer.

Let the judgment be affirmed.